IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VICTOR SOLORIO CASTELAN,

          Petitioner,         No. CIV S-09-0530-FCD-TJB

   vs.

BOARD OF PAROLE HEARINGS,

          Respondent.    <u>ORDER, FINDINGS AND RECOMMENDATIONS</u>

_____/

## I.  INTRODUCTION

Petitioner Victor Solorio Castelan is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, (1) Petitioner's requests are denied; and (2) it is recommended that habeas relief be denied.

## II.  PROCEDURAL HISTORY

On February 3, 1994, Petitioner pleaded nolo contendere to second degree murder, with a firearm use enhancement, assault with a firearm, and discharging a firearm in the San Joaquin County Superior Court.  Resp't's Answer Ex. 1, at 174, ECF No. 11 (citing CAL. PENAL CODE §§ 187, 245(a)(2), 246, 12022.5(a)).  Petitioner is currently serving a sentence of twenty years to life in prison.  Pet'r's Pet. 1, ECF No. 1.  In the instant action, Petitioner challenges the decision by the California Board of Parole Hearings (the "Board") denying Petitioner parole.  Petitioner

1    appeared before the Board on November 28, 2007.

2         On March 7, 2008, Petitioner filed a petition for writ of habeas corpus with the San

3    Joaquin County Superior Court challenging the Board's decision. *See* Resp't's Answer Ex. 1.

4    On May 15, 2008, the Superior Court issued a reasoned opinion denying the petition. *See*

5    Resp't's Answer Ex. 2. Petitioner sought relief in the California Court of Appeal, Third

6    Appellate District, and the California Supreme Court; those petitions were likewise denied, but

7    without written opinions. *See* Resp't's Answer Exs. 3-8.

8         On February 24, 2009, Petitioner filed a federal petition for writ of habeas corpus.

9    Respondent filed an answer to the petition on June 19, 2009, to which Petitioner filed a traverse

10   on July 20, 2009.

11                        III.  FACTUAL BACKGROUND

12        On . . . Sunday, June 28th, 1992 at 1:43 a.m., Antonio Mendez
          Rocha, . . . age 21, sustained multiple gunshot wounds to the head
13        and face. He was pronounced dead on arrival at San Joaquin
          General Hospital.
14
          Jose Luis Rocha Gomez, age 20, and an uncle to the victim, told
15        the circumstances of Antonio's death to investigating officers of
          the Stockton Police Department. Antonio was driving a gray four-
16        door 1978 Chrysler Cordoba northbound on El Dorado Street in the
          middle lane. Jose was his passenger.
17
          Another vehicle pulled alongside and someone began firing shots.
18        Jose bent over, Antonio applied the brakes, then collapsed. They
          hit a curb and stopped. When Jose looked outside the car, the
19        assailants had fled. Despite the broken windows and flat left rear
          tire, Jose brought the victim to the hospital.
20
          The investigating officers were assisted by an anonymous phone
21        call from an eye witness who stated that the shooting involved a
          red Chevrolet Impala, that was occupied by two subjects.
22
          On June 28th, 1992 at 8:30 p.m., an officer of the Stockton Police
23        Department observed a red two-door Chevrolet Impala roll through
          an intersection without completing a stop. The vehicle stopped at
24        B and 11th Streets, but it did not have a brake light. Knowing this
          to be a suspect vehicle, the officer summoned back-up units.
25
          Rudy, initial T, age 15, was driving the vehicle without a driver's
26        license. His front seat passenger was Angel Borg, . . . age 17. The

                                           2

officer noted that both were actively supervised by the Gang Unit of the Probation Department. The rear passenger, Raymond Galindo, age 18, was questioned and released.

Rudy T. gave the officer permission to search the car. The right armrest of the rear seat was slightly pulled up. Concealed in this area was a clear plastic box of .22 caliber bullets. The left armrest was slightly pulled away from the panel. In this area w[as] a revolver wrapped in a white T-shirt and several red shotgun shells. The vehicle that lacked brakes was towed and impounded.

Rudy T., Galindo, and Borg were transferred to the Stockton Police Department for further investigation. After being advised of their rights per Miranda, Torres and Borg advised officers that Victor Castelan was also in the vehicle at the time of the shooting. Borg also claimed that Castelan fired the weapon that killed the victim.

Officers of the Stockton Police Department met with the supervising probation officer at the Gang Unit, and with the assistance of the Gang Unit went to 2922 Malvern Court, . . . where Castelan lived. He voluntarily accompanied the officer to the police facility where he provided information regarding the weapon in question.

The officers then proceeded to 1731 South Sutter Street. At this location, they recovered the shotgun and found two subjects with warrants outstanding for their arrest. During questioning, Borg told the investigating officer that he was the driver of the suspect vehicle at the time of the shooting. He added that he helped hide the shotgun.

Rudy T. changed his story three times during testimony and finally identified Castelan as the person who fired the shotgun and killed the victim.

Pet'r's Pet. Ex. A, at 51-54; Parole Hr'g Tr. 18-21, Nov. 28, 2007 (deriving facts from "Probation Department's report").

Petitioner was sixteen years old and on probation when he committed the commitment offenses. Pet'r's Pet. Ex. A, at 54-57, 96; Parole Hr'g Tr. 21-24, 63. Petitioner's "first contact with the juvenile justice system occurred when [he] w[as] 12 years old, and [he] had 27 contacts with the juvenile justice system." Pet'r's Pet. Ex. A, at 59; Parole Hr'g Tr. 26. Petitioner stated "he began using marijuana at the age or 12 off and on," and "he drank alcohol on occasion." Pet'r's Pet. Ex. A, at 83; Parole Hr'g Tr. 50. Petitioner's psychological evaluation revealed that

3

1   Petitioner "was in the Sixth Street Gang prior to coming into prison."  Resp't's Answer Ex. 1, at

2   174.

3        Petitioner's father was a truck driver, and his mother was a baker.  Pet'r's Pet. Ex. A, at

4   57; Parole Hr'g Tr. 24.  At the hearing, Petitioner was not married, and had one child who was

5   fifteen years old.  Pet'r's Pet. Ex. A, at 58; Parole Hr'g Tr. 25.  Petitioner's family and friends

6   wrote letters in support of his release, including offers of residence and jobs.  Pet'r's Pet. Ex. A,

7   at 95-96; Parole Hr'g Tr. 62-63.

8        Petitioner performed well in prison.  *See*, *e.g.*, Pet'r's Pet. Ex. A, at 60-67, 129-30, 141;

9   Parole Hr'g Tr. 27-34, 97-98, 109.  Petitioner completed numerous self-help programs.  Pet'r's

10  Pet. Ex. A, at 60-64; Parole Hr'g Tr. 27-31; *see also* Resp't's Answer Ex. 1, at 173-74.

11  Petitioner's psychological evaluation stated Petitioner "dropped out of school in the 7th grade

12  because he was in and out of Juvenile Hall," but he "received a GED while in prison in 1995."[1]

13  Resp't's Answer Ex. 1, at 173.  Petitioner "completed the vocational welding program in '05;"

14  experienced some training in refrigeration, air conditioning, computers, small engines, and office

15  services; and "completed a program through the Blackstone Career Institute" for a "degree [as a]

16  legal assistant[] [or] paralegal" in October 2005.  Pet'r's Pet. Ex. A, at 62, 69-70, 111; Parole

17  Hr'g Tr. 29, 36-37, 79.  Petitioner's most recent psychological evaluation, dated November 14,

18  2007, concluded that Petitioner "poses a very low risk of violence in the community."  Pet'r's

19  Pet. Ex. A, at 88; Parole Hr'g Tr. 55; *see* Resp't's Answer Ex. 1, at 171-80.

20              IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

21        An application for writ of habeas corpus by a person in custody under judgment of a state

22  court can be granted only for violations of the Constitution or laws of the United States.  28

23

24        [1] At the time of the hearing, Petitioner was two classes short of achieving a high school
    diploma.  Pet'r's Pet. Ex. A, at 141-42; Parole Hr'g Tr. 109-10.  Petitioner explained he "was
    planning on completing [his] high school diploma . . . in [his] extra time," until "somebody made
25  a decision" to "recall all the books" for "guys [who] have GEDs" already, because they "[we]re
    taking valuable tools . . . ."  Pet'r's Pet. Ex. A, at 112; Parole Hr'g Tr. 80.  Petitioner was "cut
26  short" and "didn't get to finish that."  Pet'r's Pet. Ex. A, at 112; Parole Hr'g Tr. 80.

4

U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). Where more than one state court has adjudicated a petitioner's claims, a federal habeas court analyzes the last reasoned decision. *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.")). A federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to, or an unreasonable application of, clearly established federal law. *Bailey v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir. 2003). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

## V.  REQUESTS FOR REVIEW

The petition for writ of habeas corpus sets forth two requests.  Specifically, Petitioner requests:  (1) an order to show cause; and (2) appointment of counsel.  Pet'r's Pet. 19.

### A.  First Request:  Order To Show Cause

First, Petitioner requests "an[] Order to Show Cause . . . directing respondents to Show Cause, if any, why the relief sought should not be granted[.]"  *Id.*  As stated earlier, Respondent filed an answer to the petition on June 19, 2009, to which Petitioner filed a traverse on July 20, 2009.  Petitioner's request for an order to show cause is denied as moot.

### B.  Second Request:  Appoint Counsel

Second, Petitioner requests appointment of counsel in further litigation of this action.  *Id.* The Sixth Amendment right to counsel does not apply in habeas corpus actions.  *See Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).  A district court, however, may appoint counsel to represent a habeas petitioner whenever "the court determines that the interests of justice so require," and such person is financially unable to obtain representation.  18 U.S.C. § 3006A(a)(2)(B).  The decision to appoint counsel is within the district court's discretion.  *See Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986).  Courts have made appointment of counsel the exception rather than the rule by limiting it to:  (1) capital cases; (2) cases that turn on substantial and complex procedural, legal, or mixed legal and factual questions; (3) cases involving uneducated or mentally or physically impaired petitioners; (4) cases likely to require the assistance of experts either in framing or in trying the claims; (5) cases in which the petitioner is in no position to investigate crucial facts; and (6) factually complex cases.  *See generally* 1 J. Liebman & R. Hertz, Federal Habeas Corpus Practice and Procedure § 12.3b, at 383-86 (2d ed. 1994).  Appointment is mandatory only when the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations.  *See Chaney*, 801 F.2d at 1196; *Eskridge v. Rhay*, 345 F.2d 778, 782 (9th Cir. 1965).

Appointment of counsel is not warranted in this case.  Petitioner's claim is a typical claim

1  arising in a habeas petition and is not especially complex.  This is not an exceptional case

2  warranting representation on federal habeas review.  Petitioner's request for appointment of

3  counsel is denied.

4         This matter is now ready for decision.  For the following reasons, it is recommended that

5  habeas relief be denied.

6                              VI.  CLAIM FOR REVIEW

7         The petition for writ of habeas corpus sets forth one ground for relief.  Specifically,

8  Petitioner argues his due process rights were violated by the "Board decision denying parole"

9  because it "is not supported by some evidence that petitioner remains current[ly] danger[ous] to

10  public safety."  Pet'r's Pet. 4, 24.

11        A.  Legal Standard for Parole Denial

12        The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives

13  a person of life, liberty, or property without due process of law.  A person alleging a due process

14  violation must first demonstrate that he or she was deprived of a protected liberty or property

15  interest, and then show that the procedures attendant upon the deprivation were not

16  constitutionally sufficient.  *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989);

17  *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

18              1.  Liberty Interest in Parole

19        A protected liberty interest may arise from either the Due Process Clause itself or from

20  state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution

21  does not, in and of itself, create for prisoners a protected liberty interest in the receipt of a parole

22  date.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  The full panoply of rights afforded a

23  defendant in a criminal proceeding is not constitutionally mandated in the context of a parole

24  proceeding.  *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme

25  Court has held that a parole board's procedures are constitutionally adequate if the inmate is

26  given an opportunity to be heard and a decision informing him of the reasons he did not qualify

7

1  for parole.  *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979).  If a

2  state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that

3  parole release will be granted' when or unless certain designated findings are made," thereby

4  giving rise to a constitutional liberty interest.  *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*,

5  442 U.S. at 12).

6        Section 3041 of the California Penal Code sets forth the state's legislative standards for

7  determining parole for life-sentenced prisoners.  Subsection (a) provides that "[o]ne year prior to

8  the inmate's minimum eligible parole release date a panel . . . shall again meet with the inmate

9  and shall normally set a parole release date . . . ."  Subsection (b) provides an exception to the

10  regular and early setting of a life-sentenced individual's term, if the Board determines "that the

11  gravity of the current convicted offense or offenses, or the timing and gravity of current or past

12  convicted offense or offenses, is such that consideration of the public safety requires a more

13  lengthy period of incarceration . . . ."  Based on this statute, California state prisoners who have

14  been sentenced to prison with the possibility of parole have a clearly established, constitutionally

15  protected liberty interest in receipt of a parole release date.  *Allen*, 482 U.S. at 377-78 (quoting

16  *Greenholtz*, 442 U.S. at 12); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v.*

17  *Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910,

18  914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

19                   2.  Scope of Due Process Protection

20        Additionally, as a matter of California state law, denial of parole to state inmates must be

21  supported by at least "some evidence" demonstrating future dangerousness.  *Hayward v.*

22  *Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Lawrence*, 44 Cal. 4th

23  1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr.

24  3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d

25  174 (2002)).  California's "some evidence" requirement is a component of the liberty interest

26  created by the state's parole system.  *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010).  The

federal Due Process Clause requires, in turn, that California comply with its own "some evidence" requirement. *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam).  A reviewing court must "decide whether the California judicial decision approving the . . . decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

The analysis of whether some evidence supports the denial of parole to a California state inmate is framed by the state's statutes and regulations governing parole suitability determinations. *See Irons*, 505 F.3d at 851.  A reviewing court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [] constituted an unreasonable application of the 'some evidence' principle." *Id.*

### 3.  California's Parole Scheme

Title 15, section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers.  "All relevant, reliable information available to the [Board] shall be considered in determining suitability for parole." CAL. CODE REGS. tit. 15, § 2402(b).  This includes:

> [T]he circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

*Id.*  The regulation also lists specific circumstances which tend to show suitability or unsuitability for parole. *Id.* § 2402(c)-(d).

Under section 2402(c)(1), factors relating to a commitment offense tend to show

unsuitability for parole where (A) multiple victims were attacked, injured or killed; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the motive for the crime is inexplicable or very trivial in relation to the offense. *Id.* § 2402(c)(1)(A)-(E).

Other circumstances tending to indicate unsuitability include:

> (2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.
>
> (4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>
> (5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.
>
> (6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2402(c)(2)-(6).

Section 2402(d) sets forth circumstances tending to show suitability, which include:

> (1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>
> (2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.
>
> (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.
>
> (4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress had

10

1    built over a long period of time.

2    (5) Battered Woman Syndrome.  At the time of the commission of
     the crime, the prisoner suffered from Battered Woman Syndrome,
3    as defined in section 2000(b), and it appears the criminal behavior
     was the result of that victimization.
4
     (6) Lack of Criminal History.  The prisoner lacks any significant
5    history of violent crime.

6    (7) Age.  The prisoner's present age reduces the probability of
     recidivism.
7
     (8) Understanding and Plans for Future.  The prisoner has made
8    realistic plans for release or has developed marketable skills that
     can be put to use upon release.
9
     (9) Institutional Behavior.  Institutional activities indicate an
10   enhanced ability to function within the law upon release.

11   *Id.* § 2402(d)(1)-(9).

12          The overriding concern is public safety and the focus is on the inmate's *current*

13   dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  The

14   proper articulation of the standard of review is not whether some evidence supports the stated

15   reasons for denying parole, but whether some evidence indicates that the inmate's release would

16   unreasonably endanger public safety.  *In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213,

17   190 P.3d 573.  There must be a rational nexus between the facts relied upon and the ultimate

18   conclusion that the prisoner continues to be a threat to public safety.  *In re Lawrence*, 44 Cal. 4th

19   at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

20          B.  State Court Decision

21          Here, because the California Supreme Court and California Court of Appeal summarily

22   denied the petition, the state court decision appropriate for review is the Superior Court's

23   decision.  Under AEDPA's standards, the Superior Court reasonably held that "the Board's

24   conclusion is supported by some evidence" showing Petitioner was currently dangerous.

25   Resp't's Answer Ex. 2, at 183.  The Superior Court explained that this included "the fact that

26   there were multiple victims and petitioner fled the scene."  *Id.*  The Superior Court then cited

1   "hearing transcript pages 99 through 104," which included other reasons the Board denied parole.

2   *Id.* This citation shows the Superior Court considered Petitioner's (1) commitment offenses

3   involving multiple victims; (2) juvenile record and unstable social history; (3) institutional

4   disciplinary record; (4) need for additional insight; and (5) lack of adequate alcohol and gang

5   affiliation relapse prevention plans. *See id.* (citing Pet'r's Pet. Ex. A, at 131-36; Parole Hr'g Tr.

6   99-104).

7   　　　　　　　　　1.　Commitment Offenses

8   　　　First, the Superior Court properly noted that the Board considered Petitioner's

9   commitment offenses, among other factors, when denying parole. *See id.* The Board read into

10   the record the summary of Petitioner's commitment offenses, taken from the "Probation

11   Department's report." Pet'r's Pet. Ex. A, at 51-54; Parole Hr'g Tr. 18-21; *see supra* Part III. The

12   Board explained its reliance, in part, on Petitioner's commitment offense as follows:

13   　　　　　　　We've looked at this crime and there were multiple victims. The
14   　　　　　　　offense was carried out in a dispassionate manner, as the
　　　　　　　　　motivation appears to be gang-related and the victims were
15   　　　　　　　members of a rival gang. And the manner in which these four
　　　　　　　　　shotgun blasts were carried out short-range, without legal
16   　　　　　　　justification, and the use of deadly force[,] demonstrated a callous
　　　　　　　　　disregard for human suffering, as you just continued on and
17   　　　　　　　basically escaped from detection at the time.

18   Pet'r's Pet. Ex. A, at 135; Parole Hr'g Tr. 103.

19   　　　Here, the Superior Court reasonably affirmed the Board's finding that Petitioner's

20   commitment offenses involved multiple victims, were carried out in a dispassionate manner, and

21   showed a callous disregard for human suffering. Without question, Antonio, the 21-year-old

22   who died from Petitioner's gunshots, was a victim. Additionally, Petitioner's plea of nolo

23   contendere to assault with a firearm is sufficient to identify Jose as a victim, since Jose was also

24   attacked when Petitioner fired shots at the vehicle in which Jose was a passenger. CAL. CODE

25   REGS. tit. 15, § 2402(c)(1)(A) ("Multiple victims" include those who "were attacked . . . in the

26   same . . . incident[]."); *see* Pet'r's Pet. Ex. A, at 42; Parole Hr'g Tr. 9 ("[T]here are two separate

victims, the second victim is Jose [Luis] Rocha Gomez. . . . [T]herefore, it is appropriate to list a separate conviction under [Section 245(a)(2) of the California Penal Code]."); *see also* Pet'r's Pet. Ex. A, at 52; Parole Hr'g Tr. 19 ("Jose was [Antonio's] passenger" when "[a]nother vehicle pulled alongside and someone began firing shots.  Jose bent over, Antonio applied the brakes, then collapsed.").  The Superior Court reasonably found that the Board weighed the nature and gravity of Petitioner's commitment offenses when denying Petitioner parole.  *See* CAL. CODE REGS. tit. 15, § 2402(c)(1).

2.  Juvenile Record and Unstable Social History

Second, the Board appropriately considered Petitioner's extensive juvenile record and unstable social history when denying parole.  The Board noted Petitioner's "first contact with the juvenile justice system occurred when [he] w[as] 12 years old, and [he] had 27 contacts with the juvenile justice system."  Pet'r's Pet. Ex. A, at 59; Parole Hr'g Tr. 26.  The Board listed some of Petitioner's arrests as follows:

> You were arrested on December 14th, 1989 for petty theft.  The petition was adjudicated on that offense.  There was an arrest for violation of probation January 13th, 1989.
>
> There was an attempted burglary and you admitted trespassing on railroad property in regard to that petition.  An arrest on . . . March 31st, 1989, auto burglary, 459 of the Penal Code.  You admitted that petition.
>
> May 1st, 1989, violation of probation under the Welfare and Institutions Code, and you were -- A petition was filed and you were continued a ward of the Court on that petition.  That was sustained.  It appears that you were put into placement, under the discretion of the Probation Department at that time, based on that violation of probation.  You had a subsequent petition [as a] minor in possession of a firearm for the arrest on June 1st, 1989.[2]  You were placed in a residential group home as a result of that petition.

---

[2] Petitioner clarified, "In that incident, there was like six of us, gang members walking down the street.  One of them threw the gun.  When we got arrested, they charged all of us . . . for having the weapon, but [another person] admitted to it," so Petitioner "never went to Court."  Pet'r's Pet. Ex. A, at 102; Parole Hr'g Tr. 70.  The Board commented, "But that's still young to be hanging around people packing firearms."  Pet'r's Pet. Ex. A, at 102-03; Parole Hr'g Tr. 70-71.

A bench warrant was issued for runaway from the group home . . . on or about July 19th, a petition having been filed on July 18th, 1989.  And that matter resulted in a booking and replacement into the group home, and that occurred on or about August 17th, 1989.  A subsequent bench warrant was issued for runaway.  That petition was filed on . . . September 11th, 1989.

September 20th, there was a vandalism petition filed, and . . . the vandalism was dismissed as there were subsequent petitions, one of which was a possession of stolen property in which there was an admission.  And you were committed to an entity called Rite of Passage, R-I-T-E.

There w[ere] . . . two petitions in October for violations of probation, a third petition in October of 1990 for violation of probation.  It resulted in a booking in which Probation filed a supplemental W and I petition, resulting in placement in March of 1991 into Aaron's Boys' Home.

It appears that after the placement at Aaron's Boys' Home, there was a petition filed with the Court in April of 1991 for runaway from placement, and that bench warrant remained outstanding until your arrest in November of 1991.  And that refers to additional matters ultimately resulting in a placement in 1992 at Natividad Group Home.

There was a subsequent bench warrant and a petition for runaway from placement subsequent to the placement in Natividad Group Home.  Ultimately, in May of 1992, you were returned to your mother's home and supervised by the Probation Gang Unit.

Pet'r's Pet. Ex. A, at 55-57; Parole Hr'g Tr. 22-24.

The Board also recounted that Petitioner "received a number of infractions while incarcerated at the Juvenile Justice Center."  Pet'r's Pet. Ex. A, at 58; Parole Hr'g Tr. 25.  These included:  (1) belligerence and hostility toward staff; (2) gang behavior, including a fight, on December 22, 1992; (3) possession of contraband; (4) tampering with Petitioner's handcuffs; and (5) an escape attempt on January 3, 1993.  Pet'r's Pet. Ex. A, at 59; Parole Hr'g Tr. 26.

When rendering its decision, the Board recognized "that at the age of [Petitioner's] first contact," Petitioner was not "fully developed" nor "fully mature by any means."  Pet'r's Pet. Ex. A, at 136; Parole Hr'g Tr. 104.  But, the Board noted "the conduct does involve . . . serious threats such as breaking in[to] cars for auto burglary at the age of 13, which is not normal," and

14

1   "[b]eing associated with handguns . . . ."  Pet'r's Pet. Ex. A, at 136; Parole Hr'g Tr. 104.  The

2   Board was concerned over the "failed efforts by people to correct [Petitioner's] criminality," as

3   Petitioner had "numerous attempts" for rehabilitation through "group home" and "boys' camp"

4   placements.  Pet'r's Pet. Ex. A, at 136; Parole Hr'g Tr. 104.

5        At the hearing, the Board also examined Petitioner's unstable social history.  When

6   inquiring about how Petitioner planned to reside with his mother if paroled, the Board asked if

7   this was "a good place for [Petitioner] to be in [his] parole plans."  Pet'r's Pet. Ex. A, at 103;

8   Parole Hr'g Tr. 71.  The Board explained, "This is a household that you rejected by all of these

9   runaways, all this out of control. . . . [H]ow many times did you get placed back in there and it

10  didn't work out?"  Pet'r's Pet. Ex. A, at 103; Parole Hr'g Tr. 71.  Petitioner admitted that at the

11  time, he "resented" his mother, and he "called her names behind her back[.]"  Pet'r's Pet. Ex. A,

12  at 103-04; Parole Hr'g Tr. 71-72.  Petitioner also conceded that "when [he] was young, [he] dealt

13  with feelings of rejection and insecurity by turning to gangs.  Gangs became [his] family and [he]

14  was willing to do anything to please them."  Pet'r's Pet. Ex. A, at 125; Parole Hr'g Tr. 93.  When

15  denying parole, the Board also pointed out Petitioner started "early [with] alcohol."  Pet'r's Pet.

16  Ex. A, at 131; Parole Hr'g Tr. 99.  The Board appropriately reviewed Petitioner's juvenile record

17  and unstable social history when denying parole.  *See* CAL. CODE REGS. tit. 15, § 2402(b), (c)(2)-

18  (3); *cf. id.* § 2402(d)(1)-(2), (6).

19               3.  Institutional Disciplinary Record

20       Third, the Board properly considered Petitioner's institutional disciplinary record when

21  denying parole.  The Board observed that Petitioner had two 115 violations:  (1) "February 27th

22  of '02 for possession of inmate alcohol;" and (2) "February 18th of 2000 for failure to report to

23  an assignment."  Pet'r's Pet. Ex. A, at 77; Parole Hr'g Tr. 44.  At the hearing, Petitioner

24  acknowledged that his decision to manufacture alcohol in prison, which he knew was a felony,

25  "was just driven by stupidity."  Pet'r's Pet. Ex. A, at 78; Parole Hr'g Tr. 45.  Petitioner stated that

26  he "didn't accept responsibility" for the offense at the time, but at the hearing, he did.  Pet'r's

1 | Pet. Ex. A, at 78; Parole Hr'g Tr. 45.

2 |      The Board also remarked that Petitioner's most recent 128 violation was on September 6,

3 | 2005, for a "procedural violation on mail."  Pet'r's Pet. Ex. A, at 79; Parole Hr'g Tr. 46.

4 | Petitioner sought to explain this violation, but the Board replied, "You don't need to.  This Panel,

5 | I don't consider 128s."  Pet'r's Pet. Ex. A, at 125; Parole Hr'g Tr. 93.

6 |      When denying parole, the Board based its decision, in part, on the most recent 115

7 | violation, reasoning:

8 | 
9 |         The 115 that involves alcohol, which was a contributing factor to the pattern of juvenile misconduct shortly before the homicide, that 115 was 2002, and that was not in the distant past.  It seems to have really triggered a wake-up call in you that resulted in a lot of progress in a short time.  We'd like to see the gains that you've maintained over, established over a longer period of time.

10 | 
11 | 

12 | Pet'r's Pet. Ex. A, at 136; Parole Hr'g Tr. 104.  The Board properly weighed Petitioner's

13 | institutional disciplinary record against Petitioner when denying parole.  *See* CAL. CODE REGS.

14 | tit. 15, § 2402(b), (c)(6).

15 |      4.  Need for Additional Insight

16 |      Fourth, the Board appropriately found Petitioner needed additional insight into the

17 | commitment offenses.  At the hearing, the Board asked Petitioner whether he "believe[d] that

18 | [he] still pose[d] a risk to the safety of people outside of the prison walls."  Pet'r's Pet. Ex. A, at

19 | 79; Parole Hr'g Tr. 46.  Petitioner responded, "No."  Pet'r's Pet. Ex. A, at 80; Parole Hr'g Tr. 47.

20 | The Board then inquired what made Petitioner believe he was a different man at the hearing than

21 | when he came into prison for the commitment offenses.  Petitioner answered, in part:

22 |         Well first, I grew up.  You know when this happened, I was young[.] . . . What other people thought about me was more important than what I thought about myself.  So I needed you to like me for me to like me.  That's what I thought at the time, so I was willing to do whatever[.] . . . I look back and I get embarrassed because of a lot of things that I thought . . . are different.

23 | 
24 | 
25 | 

26 |         At that time, I thought I knew a lot.  I thought I knew everything.  And when I look back, I realize there's a lot I didn't know.  But at

1   that time, you couldn't convince me and you couldn't tell me that
    look, I've experienced life more than you. . . . I was like[,] you just
2   don't understand me . . . . I know what I'm doing, I feel what I'm
    doing is right.

3
    . . . I felt like I really had a family in gangs.  That's what I honestly
4   felt.  I was willing to die.

5   Pet'r's Pet. Ex. A, at 80-81; Parole Hr'g Tr. 47-48.

6           When denying parole, the Board stated that Petitioner should "eliminate the reference to

7   well, I was just a young guy, and it seemed like the thing to do.  Break it down even more."

8   Pet'r's Pet. Ex. A, at 101; Parole Hr'g Tr. 133.  The Board reasoned, "[T]here's a lot of people

9   who don't get involved with gangs in tough neighborhoods," and "[t]here's also a lot of people

10  who get involved in gangs that don't end up with homicide."  Pet'r's Pet. Ex. A, at 100-01;

11  Parole Hr'g Tr. 132-33.  The Board urged Petitioner to develop "more insight[] as to the life

12  crime . . . to give you more confidence in answering those questions."  Pet'r's Pet. Ex. A, at 101;

13  Parole Hr'g Tr. 133.  The Board properly determined Petitioner needed additional insight into the

14  commitment offenses when denying parole.  *See* CAL. CODE REGS. tit. 15, § 2402(b); *In re*

15  *Shaputis*, 44 Cal. 4th at 1261, 82 Cal. Rptr. 3d 213, 190 P.3d 573 (holding "gravity of the offense

16  and petitioner's lack of insight and failure to accept responsibility" constituted some evidence

17  "suggest[ing] petitioner remains a current danger to the public"); *cf.* CAL. CODE REGS. tit. 15, §

18  2402(d)(3).

19          5.  Lack of Adequate Alcohol and Gang Affiliation Relapse Prevention Plans

20          Fifth, the Board properly factored in Petitioner's lack of relapse prevention plans for

21  alcohol and gang affiliation.  The Board observed that Petitioner "began drinking alcohol at a

22  very early age and . . . smoking marijuana."  Pet'r's Pet. Ex. A, at 77; Parole Hr'g Tr. 44.

23  Petitioner's latest 115 violation in 2002 was for possession of inmate alcohol.  Pet'r's Pet. Ex. A,

24  at 77; Parole Hr'g Tr. 44.  In prison, Petitioner stated he "went on and off" to Alcoholics

25  Anonymous (AA), but "started consistently in 2003 . . . because [his] brother died in an alcohol-

26  related accident.  And then [Petitioner went] and attempt[ed] to make prison alcohol."  Pet'r's

1  Pet. Ex. A, at 110-11; Parole Hr'g Tr. 78-79.  Petitioner decided, "I need to go check this

2  program out . . . . I did it on my own . . . . I felt it was worth a shot at least."  Pet'r's Pet. Ex. A, at

3  111; Parole Hr'g Tr. 79.

4       At the hearing, Petitioner admitted he did not know all the twelve steps.  Pet'r's Pet. Ex.

5  A, at 73; Parole Hr'g Tr. 40.  Petitioner stated he was "struggling" with step three.  Pet'r's Pet.

6  Ex. A, at 68, 73, Parole Hr'g Tr. 35, 40.  Petitioner explained:

7            Step Three requires that you . . . come to the God of your
             understanding, and my problem is that, I believe in God . . . but
8            what I've been taught growing up is that there's only one God, . . .
             and that's Christ.  So I'm feeling that . . . I'm being forced to
9            convert to a religion because of this.  Because you can't have any
             other God."

10

11 Pet'r's Pet. Ex. A, at 68, Parole Hr'g Tr. 35.

12       Later, the Board asked Petitioner whether he was "able to work through the eighth and

13 ninth steps."  Pet'r's Pet. Ex. A, at 41, Parole Hr'g Tr. 74.  At first, Petitioner responded that he

14 did not know what the steps were, but then he remembered that step eight was to "recognize the

15 harm you'd done and make amends, write a letter . . . ."  Pet'r's Pet. Ex. A, at 41, Parole Hr'g Tr.

16 74.  Petitioner stated he wrote a letter, but he did not "have it anymore."  Pet'r's Pet. Ex. A, at 41,

17 Parole Hr'g Tr. 74.

18       When denying Petitioner parole, the Board mentioned that "the religious aspects and

19 [Petitioner's] struggle with that are not of a concern to the Board . . . , because we do not hold

20 against you your personal religious beliefs nor the fact that you're struggling to adopt religions

21 beliefs in whatever therapy program."  Pet'r's Pet. Ex. A, at 106, Parole Hr'g Tr. 138.  The Board

22 elaborated, though, that "we'd like to see you be able to go through all 12 Steps, be able to

23 verbalize that, [and] the values that you've learned from that."  Pet'r's Pet. Ex. A, at 106-07,

24 Parole Hr'g Tr. 138-39.  The Board stated, "Alcohol was a significant factor in [Petitioner's] life

25 as [he] had . . . 27 contacts with the juvenile authorities."  Pet'r's Pet. Ex. A, at 99, Parole Hr'g

26 Tr. 131.  The Board "want[ed] Petitioner to sit down with [his] sponsor and just say, the Board . .

18

1   . ha[s] talked to me about what is a substance relapse prevention plan," and "can you tell me

2   more about this and what's involved."  Pet'r's Pet. Ex. A, at 99, Parole Hr'g Tr. 131.  That way,

3   Petitioner could "recogniz[e] the triggers of stress in [himself] both then and now, [and] the

4   coping mechanisms [he has] developed."  Pet'r's Pet. Ex. A, at 99, Parole Hr'g Tr. 131.

5        Additionally, the Board expressed concern over "retaliation issues" if Petitioner were

6   paroled, Pet'r's Pet. Ex. A, at 75, Parole Hr'g Tr. 107, referencing the "NFL player [who] died as

7   a result of being shot."  Pet'r's Pet. Ex. A, at 76, Parole Hr'g Tr. 108.  Although the NFL player

8   "changed and got out of that gang[,] . . . the guys he used to hang with didn't change."  Pet'r's

9   Pet. Ex. A, at 76, Parole Hr'g Tr. 108.  Petitioner did not know if his "old gang" still existed, and

10  did not know if the victim's gang still existed.  Pet'r's Pet. Ex. A, at 77-78, Parole Hr'g Tr. 109-

11  10.

12       Likewise, the Board wanted Petitioner to "prepare a violence gang relapse prevention

13  plan for the [next] Board" hearing.  Pet'r's Pet. Ex. A, at 100, Parole Hr'g Tr. 132.  The Board

14  reasoned, Petitioner was a "young guy," he "will be on the streets as a young man," and "it's

15  important that you use the same strategy for substance relapse and incorporate that into gangs."

16  Pet'r's Pet. Ex. A, at 100, Parole Hr'g Tr. 132.  The Board asked Petitioner to delve into the

17  "psychological mechanisms . . . as to why" Petitioner joined a gang, "because there's a lot of

18  people who don't get involved with gangs in tough neighborhoods."  Pet'r's Pet. Ex. A, at 100,

19  Parole Hr'g Tr. 132.  The Board specified the relapse plan should involve "the identification of

20  the stressors, why it appealed to you, and then . . . why was it related to homicide, and why it

21  won't happen again."  Pet'r's Pet. Ex. A, at 101, Parole Hr'g Tr. 133.  The Board found

22  Petitioner lacked adequate alcohol and gang affiliation relapse prevention plans when denying

23  parole.  *See* CAL. CODE REGS. tit. 15, § 2402(b); *cf. id.* § 2402(d)(8).

24       In sum, the Superior Court reasonably concluded that "[t]he Board's conclusion is

25  supported by some evidence" indicating Petitioner's current dangerousness.  *See* Resp't's

26  Answer Ex. 2, at 183.  The Superior Court's citation to the hearing transcript shows it considered

1   Petitioner's (1) commitment offenses involving multiple victims; (2) juvenile record and unstable

2   social history; (3) institutional disciplinary record; (4) need for additional insight; and (5) lack of

3   adequate alcohol and gang affiliation relapse prevention plans.  *See id.* (citing Pet'r's Pet. Ex. A,

4   at 131-36; Parole Hr'g Tr. 99-104).  These factors demonstrate a nexus between the facts in the

5   record regarding Petitioner's commitment offenses and the ultimate conclusion that Petitioner

6   still posed a risk of danger or threat to the public.  These factors also independently demonstrate

7   some evidence in the record that Petitioner was not suitable for parole.  The Superior Court

8   reasonably concluded that the Board's decision withstands the minimally stringent "some

9   evidence" test and has not violated Petitioner's right to due process of law.

10                                VII.  CONCLUSION

11          For the foregoing reasons, IT IS HEREBY ORDERED that:

12          1.  Petitioner's request for an order to show cause is DENIED as moot; and

13          2.  Petitioner's request for appointment of counsel is DENIED.

14          IT IS HEREBY RECOMMENDED that Petitioner's application for writ of habeas corpus

15   be DENIED.

16          These findings and recommendations are submitted to the United States District Judge

17   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

18   days after being served with these findings and recommendations, any party may file written

19   objections with the court and serve a copy on all parties.  Such a document should be captioned

20   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

21   shall be served and filed within seven days after service of the objections.  Failure to file

22   objections within the specified time may waive the right to appeal the District Court's order.

23   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

24   (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

25   appealability should be issued in the event he elects to file an appeal from the judgment in this

26   ///

case. *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

deny certificate of appealability when it enters final order adverse to applicant).

DATED:       November 12, 2010.

_____

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE